CARMEN ARIAS, Plaintiff and Appellant, *v.* CARMEN TORRES CÓRDOVA DE LUFF, ET AL., Defendants and Appellees.

No. 11172.    Argued August 9, 1954.—Decided April 29, 1955.

ON MOTION FOR RECONSIDERATION

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

The plaintiff-appellant has filed a motion for reconsideration of our *per curiam* opinion and judgment of May 17,

1954 affirming the judgment of the Superor Court in favor of the defendants in this case. Our *per curiam* opinion reads as follows:

"The plaintiff sued the defendants in the Superior Court for collection of money. After a trial on the merits, the trial court entered judgment in favor of the plaintiff. However, after the defendants filed a motion for reconsideration and furnished the court with the transcript of the evidence, it set aside its first judgment and entered a new judgment in favor of the defendants.

"On appeal, the only assignment of error is as follows:

" 'The Superior Court, San Juan Part, through Judge Rodolfo Ramírez Pabón, committed manifest error in its judgment of January 13, 1953, the judgment appealed from here, the said judgment being contrary to the testimony and in addition contrary to law.'

"There was a sharp conflict in the testimony in this case. The result depends on whether the plaintiff or the defendant Carmen Torres told the truth in their respective testimony with reference to the transaction which took place between them. Both parties concede that at the beginning of August 1949, the plaintiff delivered to the defendant Carmen Torres, in three different sums and on three different occasions, $4,334. The plaintiff testified that she made loans to Carmen Torres for several days, without interest, which came due on August 31, 1949, and that on the latter date Carmen Torres delivered to the plaintiff three checks amounting to $4,805, which were returned by the bank because of insufficient funds. On the other hand, the defendant testified that she knew one Elías Lopés, who borrowed money and paid a high interest thereon; that she did business with him, lending him her own money and recommended him to her friends; that Carmen Arias called her in order to give her money to place it with Lopés; that before the delivery of the sums of money in August 1949, Carmen Arias on a number of occasions had given her money to place it with Lopés, and Lopés had paid it with interest; that Carmen Torres made nothing on these operations which she did for her friend; that Lopés customarily gave a document as a receipt, but at times the document was late and then she, Carmen Torres, gave those checks. She gave the checks, not

on August 31, but on August 3, 10 and 5, that is to say, the three dates in 1949 on which Carmen Arias gave her the money that never was repaid; that it was not paid because Lopés disappeared at that time and when he reappeared it was 'in order for the trial to be held.'

"In addition to the three checks, the plaintiff identified and the defendants thereafter presented in evidence, a paper, the major part of which is in a large handwriting, and which the plaintiff identified as hers, and the rest in a small handwriting, which the plaintiff identified as that of the defendant, Carmen Torres. On this paper the words 'interest' and 'capital' were written *by the plaintiff*. The paper apparently shows that the plaintiff had made a loan to the defendant of $4,334 and would receive $4,805 in less than a month, and that the difference of $471 was interest. (This would of course be usurious.) The complaint was originally for $4,805, including interest, although during the trial the plaintiff requested permission, which was granted, to amend the complaint in order to ask for only the sum of $4,334.

"The record contains sufficient evidence to support the finding of the trial court that the defendant Carmen Torres did not borrow any money from the plaintiff, but rather that she received money as an intermediary—in legal effect, as agent—in order to place it on loan with Elías Lopés, and that the checks made out in favor of the plaintiff were a sort of acknowledgment or receipt, which the defendant Carmen Torres gave the plaintiff when the document from Lopés for each loan made to him 'did not come on time'. We shall therefore not interfere with the findings of fact of the trial court to this effect.

"The judgment of the Superior Court will be affirmed."

When we issued the foregoing *per curiam* opinion, we of course relied on the conclusion of the trial court that Carmen Torres told the truth as to the transaction between her and the plaintiff. The trial court stated—in coming to that conclusion—that ". . . it has given due weight to the circumstance that the plaintiff departed from the truth with respect to a relevant part of her testimony, that is to say, she denied persistently that the loan made by her bore any interest, when the proof, especially the documentary evidence:

in the handwriting of the plaintiff herself, shows that the loan to which the plaintiff agreed was on the basis of interest, of usurious interest." We think, under all the circumstances, that the trial court was entitled to weigh the evidence in this manner. In addition to the figures written by the plaintiff herself on the paper introduced in evidence, the checks made out by Carmen Torres and the original complaint filed herein by the plaintiff are both for $4,805, which includes the usurious interest. These documents tend to discredit the plaintiff's story that the agreement between the parties was that when the plaintiff cashed the three checks, the plaintiff would reimburse Carmen Torres for the amount included as interest. And if this phase of the plaintiff's testimony—which was adduced in order to counteract the possible defense of usury—was untrue, the trial court was entitled to take that fact into consideration in determining whether to believe the plaintiff that the loan was to Carmen Torres or whether to believe the latter that she was merely the plaintiff's agent in making a usurious loan to a third party.

The trial court may also have been led to believe Carmen Torres' version of the transaction between her and the plaintiff because the plaintiff's testimony was improbable in other respects. The plaintiff testified that although she and Carmen Torres were old friends and the latter ". . . is a hard-working, honorable and good person . . .", the plaintiff was not interested and did not find out why Carmen Torres needed the money, which constituted the plaintiff's lifetime savings. She also testified that although the plaintiff visited Carmen Torres several times seeking to collect the loan, the latter never explained to the plaintiff why she could not pay her. It is unlikely that a person would lend her lifetime savings to a friend without finding out why the latter needed the money. Nor is it likely that an old and honorable friend would not explain why she could not repay the loan. Under these cir-

cumstances it apparently seemed more plausible to the trial court (1) that the reason for the delivery of the money by the plaintiff to Carmen Torres was that the latter was acting as agent for the plaintiff in lending it at usurious interest to a third party, and (2) that the explanation of the non-payment of the loan was that the third party had pocketed the money and disappeared. Accordingly, the trial court did not believe the plaintiff's testimony that because she trusted Carmen Torres the plaintiff obtained no receipts from the former for the loans the plaintiff made to Carmen Torres on three dates during August 1949, and that the three checks signed by Carmen Torres were given to the plaintiff on August 31, 1949 as payment to the plaintiff for such loans. On the contrary, the trial court placed credence in the testimony of Carmen Torres that the three checks, although dated August 31, 1949, were given separately by her to the plaintiff on each of the three dates she received sums of money from the plaintiff as receipts for the loans which the plaintiff was making to a third party through Carmen Torres as agent. We reiterate the statement in our *per curiam* opinion that we find nothing in the record which enables us to interfere with the findings of fact of the trial court in this case.

■ In her motion for reconsideration the plaintiff insists on two legal points. First, she argues that under the Negotiable Instruments Law the checks issued by Carmen Torres to the plaintiff constitute contracts to pay the money claimed and that the defendants are not entitled to show that they were in fact receipts. If these checks were in the hands of a holder in due course, the defendants could not contend as against the former that they were in fact receipts rather than checks. But the plaintiff is the alleged payee. And as between the drawer and the payee of a check, under the circumstances of this case the drawer may show if she can by competent evidence that the instrument was in fact

a receipt rather than a check by virtue of a collateral agreement between the drawer and the payee. This does not violate the parol evidence rule. To hold otherwise would be to close the door against proof by the defendants of attempted fraud on the part of the plaintiff.[1] 3 Williston on *Contracts*, revised ed., § 644, pp. 1853 *et seq.;* IX Wigmore on *Evidence*, 3d ed., § 2438, p. 122; 1 *Restatement, Contracts*, § 240, Comment b, p. 336, and Comment on Subsection (1b), pp. 337–8; Britton on *Bills and Notes*, pp. 570 *et seq.; Bigas* v. *Monforte*, 76 P.R.R. 289; *Annotations*, 20 A.L.R. 421, 54 A.L.R. 702, 105 A.L.R. 1346. *Cf.* II *Restatement, Agency*, § 324, Illustration 1, as to admissibility of parol evidence to reform a negotiable instrument; *Annotation*, 75 A.L.R. 1519. See also, 13 L.R.A. 649; 43 L.R.A. 449; 128 Am.St.Rep. 609; *Davis* v. *Davis*, 36 S.E.2d 417 (W.Va., 1945); *Clarke* v. *Clarke*, 152 P.2d 908 (Okla., 1944); *Vincent* v. *Russell*, 201 Pac. 433 (Ore., 1921); *Brook* v. *Látimer*, 24 Pac. 946 (Kan., 1890).[2]

The second point made on reconsideration by the plaintiff is that " . . . the mere testimony of an alleged agent cannot establish agency *unless there is corroboration* with other evidence or there was an acceptance or an admission on the part of the principal and therefore the testimony of Carmen Torres de Luff in the lower court is not admissible

---

[1] As we have seen, the said proof was that—using checks drawn by Carmen Torres to the order of the plaintiff, but which by agreement of the parties would be receipts for money which the plaintiff gave Carmen Torres to deliver to a third party as loans by the plaintiff to the latter —the plaintiff was attempting to collect from Carmen Torres and her husband for usurious loans which the plaintiff in fact made to the third party through Carmen Torres acting as agent for the plaintiff.

[2] The plaintiff relies on §§ 538, 377–379, 404, 413, 414 and 436, Code of Commerce, 1932 ed., which are some of the provisions of the Negotiable Instruments Law; Note, 21 L.R.A.(N.S.) 704; 2 Daniel on *Negotiable Instruments* § 1646; *Economy Fuse & Mfg. Co.* v. *Standard Electric Mfg. Co.*, 194 N.E. 922 (Ill., 1935); *Camas Prairie State Bank* v. *Newman*, 99 Pac. 833 (Ida., 1909); *Deal* v. *Atlantic Coast Line R. Co.*, 144 So. 81 (Ala., 1932); 5 R.C.L. pp. 478 *et seq.* We find nothing in these authorities which supports the position of the plaintiff in this case.

nor can it be considered for the purpose of weighing the evidence in order to determine the credibility of the evidence." The plaintiff relies on *Maceira* v. *Pietri et al.*, 30 P.R.R. 545; *Fuentes* v. *Canetty*, 39 P.R.R. 160; *Cayuga Linen etc., Inc.* v. *Crédito y Ahorro Ponceño*, 41 P.R.R. 462; *Fajardo* v. *Schlüter & Co., Succrs.*, 43 P.R.R. 263; and *Pol* v. *Suau, Fiol & Co.*, 44 P.R.R. 67.

These cases do not stand, as the plaintiff seems to believe, for the proposition that the testimony of an alleged agent —as distinguished from his extra-judicial statements—is either inadmissible or must be corroborated. On the contrary, the *Fajardo* and *the Cayuga Linen* cases specifically hold exactly the opposite. In the *Fajardo* case we said at p. 264:

"We agree with the appellant that the district court was mistaken in holding that the testimony of an agent is not of itself sufficient to prove the agency. *People* v. *South Atlantic Fruit Co.*, 25 P.R.R. 620 and *Quintana Reyes* v. *Lejeune*, 37 P.R.R. 682 do not reach such a decision. In *Cayuga Linen, etc. Inc.*, v. *Crédito y Ahorro Ponceño*, 41 P.R.R. 462, we took occasion to correct a misstatement in regard to the same matter. In other words, the rule is that the declarations made to others are not admissible, but the testimony of the agent himself would tend to prove the agency. . . ."

In the *Cayuga Linen* case, we stated the correct rule at pp. 466–7 as follows:

"Now, while there is a general principle of law that the declarations of an agent are not competent to prove the agency, this only applies to declarations made out of court when quoted by others, and an agent is perfectly competent to testify as to his agency, although the weight of his testimony is a different matter, especially with respect to the extent of the agency. That an agent may so testify is a conclusion to be derived from the following authorities: *Render et al.* v. *Ragan et al.*, 102 Pac. 427; *Joslyn* v. *Cadillac Automobile Co.*, 177 Fed. 863; 2 C. J. 933, where it is said: 'The rule that the declarations of an agent are, as against his principal, inadmissible to prove the fact of

his agency does not apply to his testimony as a witness on the trial in which such fact is in issue.'

"Perhaps in some of our opinions we have not made this distinction as carefully as it should have been, because the matter was heretofore never directly involved. For example, in *Orange Rice Milling Co.* v. *Barasorda*, 40 P.R.R. 480, 482, we said that 'Aside from the general principle that an agency is not to be proved by the sole declaration of an agent, the whole record does not reveal any such general agency.' The case, however, did not turn upon the fact of agency, but the extent thereof, and the statement, so far as it applied to the testimony of the agent in that case, was mere *obiter dictum*." [3]

In *People* v. *Compañía Insular de Transporte, Inc.*, 46 P.R.R. 576, which is not cited by the plaintiff, we said at p. 577: "The appellant bases its first assignment of error upon the contention that the testimony of the driver of the truck was inadmissible to show the relationship of the principal and the agent; but in the cases of *Cayuga Linen, Etc., Inc.*, v. *Crédito y Ahorro Ponceño*, 41 P.R.R. 462, and *Fajardo* v. *Schlüter & Co., Succrs.*, 43 P.R.R. 263, we decided that the agency might be proved by the testimony of the agent at the trial, a rule of evidence which is also applicable to criminal cases." *Cf.* § 397, par. 5, Code of Civil Procedure, 1933 ed.

The doctrine enunciated in our cases is in accord with the rule in other jurisdictions. "The rule that 'the declarations of an agent are not admissible to prove the fact of agency,' refers exclusively to declarations made by the agent outside the courtroom, since it is well settled that when on the witness stand, the agent may testify what his principal

---

[3] Similarly, the dictum in *Fuentes* v. *Canetty*, *supra*, 162, that ". . . the testimony of an agent is not proof of the agency . . ." is erroneous; it is not in accord with our cases or the cases elsewhere.

The *Maceira* and *Pol* cases are not relevant here. The former merely holds that the testimony therein did not show "by positive proof" that an agent had authority to bind his principal by a lease for a term of years. In the latter we indicated that the testimony of the alleged agent in that case had in fact been corroborated; but at no point did we say that such corroboration was required as a matter of law.

told him to do, and by such testimony establish the fact of the agency. . . ." *Annotation*, 3 A.L.R. 2d 598, 599; 2 *Restatement, Agency*, § 285(a), p. 642; IV Wigmore on *Evidence*, § 1078, p. 125, and 1953 Pocket Supp., pp. 51–2, citing numerous state cases, including *People* v. *Compañía Insular de Transporte, Inc., supra; Posko* v. *Climatic Control Corp.*, 84 A. 2d 906, 909 (Md., 1951); *Stern* v. *Dekelbaum*, 34 A. 2d 272, 273 (Pa., 1943); *Shama* v. *United States*, 94 F. 2d 1, 5 (C.A. 8, 1938); *Montgomery Production Cred. Ass'n* v. *M. Hohenberg & Co.*, 12 So. 2d 865 (Ala., 1943); *Commercial Solvents* v. *Johnson*, 69 S.E. 2d 716 (N.C., 1952); *Johnson* v. *Associated Seed Growers*, 3. N.W. 2d 332 (Wis., 1942); *Bregman Screen & Lumber Co.* v. *Bechefsky*, 83 A. 2d 804 (N.J., 1951); *Freeborn* v. *Davis*, 122 S.W. 645 (Tex., 1938); 23 U. Cin. L. Rev. 269 (1954); 37 Mich. L. Rev. 784; 47 Col. L. Rev. 1227; 60 Harv. L. Rev. 976. *Cf.* 2 Morgan, *Basic Problems of Evidence*, pp. 235–7; Rule 508, *Model Code of Evidence; Annotations*, 150 A.L.R. 623, 80 A.L.R. 604.

In view of the foregoing, the testimony of Carmen Torres showing in detail that she did not borrow the money herein herself but was in fact the agent of the plaintiff in lending it to a third party was admissible in evidence. And her testimony, together with the documentary evidence and the other circumstances of this case, was sufficient to support the judgment of the trial court in favor of the defendants.

For the reasons stated, the motion for reconsideration filed by the plaintiff will be denied.

Mr. Justice Sifre did not participate herein.

———

MR. JUSTICE BELAVAL, with whom MR. JUSTICE NEGRÓN FERNÁNDEZ concurs, dissenting.

This is a very simple case which the legal experts have complicated greatly. In August, 1949, Carmen Torres Cór-

dova de Luff obtained from Carmen Arias certain loans of money in order to lend the money, in turn, to Elías Lopés.

The first clear picture of the situation is found in the pleadings filed by the parties. In her complaint, the plaintiff, Carmen Arias, alleged the following facts:

"2. The plaintiff alleges that prior to the date of filing of this complaint and during the months prior to August 31, 1949, the defendant, Carmen Torres Córdova de Luff, obtained a loan from the plaintiff in the amount of four thousand, eight hundred and five dollars (4,805), binding herself to pay it on August 31, 1949, which neither of the defendants has paid up to now, notwithstanding plaintiff's personal demands and those of her undersigned attorney.

"3. The plaintiff alleges that in order to secure the payment of said sum of money the defendant, Carmen Torres Córdova de Luff, issued three checks which she signed against the Crédito y Ahorro Ponceño, San Juan Branch, dated August 31, 1949, payable to the plaintiff in the amounts of $3,080, $1,195 and $530, and said checks having been presented for collection on September 8, 1949, they were not honored in said bank because the defendant did not have sufficient funds."

Answering said pleadings, the defendants asserted the following special defenses:

"1. The Defendants allege that the plaintiff employed the defendant, Carmen Torres Córdova de Luff, as intermediary to place the money on loan with a third party.

"2. That the plaintiff required the defendant, Carmen Torres Córdova de Luff, to issue those checks as receipts for said amount of money to be used solely and exclusively as substitutes for receipts but not checks to be presented for collection, since the plaintiff was well aware that the defendant did not have an account in the bank to cover said checks.

"3. That the plaintiff used to collect and collected usurious interest for the amount of money which she delivered to the defendant, as an intermediary, to be placed as loans.

"4. That the defendants do not owe the plaintiff the amount alleged in the complaint or any other greater or less amount of money."

These averments clearly show the position taken by each party to litigate the question in issue. The plaintiff alleged that "the defendant, Carmen Torres Córdova de Luff, *obtained a loan* from the plaintiff amounting to four thousand, eight hundred and five dollars ($4,805) binding herself to pay it on August 31, 1949, which she has heretofore failed to do." The defendants alleged: (1) that the plaintiff employed the defendant, Carmen Torres Córdova de Luff, as intermediary *to place the money* on loan *with a third party;* (2) that the plaintiff demanded "the defendant, Carmen Torres Córdova de Luff, to issue certain checks as receipts for said amount of money, to be used solely and exclusively as substitutes for receipts"; (3) that the plaintiff *used to collect and collected usurious interest* for the amount of money which she delivered to the defendant as an intermediary, *to be placed on loans;* (4) "that the defendants do not owe the plaintiff the amount alleged in the complaint or any other greater or less amount of money."

At the hearing of the case, Mr. Harry M. Besosa, plaintiff's counsel, stated his theory of his case as follows: "Your Honor, the theory of the plaintiff is as follows: "That about August 1949, the plaintiff lent to the defendant $4,334 in three different amounts within the month of August, 1949. That at the end of August, 1949, the defendant gave to the plaintiff three checks as payment of said debts, and that those checks, when presented to the bank, were not honored because of insufficient funds and therefore, said amount is outstanding."

The defendant's counsel at said hearing, Mr. Jorge Luis Córdova Díaz, announced his theory of the case as follows: "The theory of the defendant is the following, your Honor. That it was not a loan. *That it was an agency* by which the plaintiff gave money to the defendant *to be invested by the latter*, that is, in order to lend it to a particular person, which she did; and the loan was lost. This case is a sequel

of one with which the court is probably acquainted, concerning a certain Mr. Lopés and a certain Lube Sierra . . ."

Plaintiff's counsel: "We are going to object to that. There are no allegations to support that theory."

Counsel for the defendant: "Very well. *We are not very interested in that aspect.* In any event that is defendant's theory."

As may be seen, by the allegations of the defendants, the theory of the diligent intermediary is changed at the hearing of the case into that of an agency.

The case commenced with a motion by plaintiff's counsel:

Plaintiff's counsel: "I am going to ask defendant's counsel to let me have a document which he showed me yesterday in his office by virtue of a motion for inspection of documents. . ."

Defendant's counsel: "Yes, I shall give it to my colleague."

Plaintiff's counsel: "To identify it, Your Honor. Have it marked as an exhibit."

Judge: "It is marked as plaintiff's exhibit No. 1."

Let us now consider the plaintiff's testimony:

"Plaintiff:

"Question: Your name?

"Witness:

"Answer: Carmen Arias Andréu.

"Q. Where do you work, madam?

"A. In the Department of the Interior.

"Q. Do you know the defendant, Mrs. Carmen Torres Córdova de Luff?

"A. I have known her all my life.

"Q. Up to the time of the transaction were you friends or not?

"A. We were friends from childhood.

"Q. Tell me, Doña Carmen—showing the witness the document marked exhibit 1—who wrote part of this paper which I am showing you?

"A. This is my handwriting. All of this.

"Q. Do you recognize the large handwriting? Is it yours?

"A. Yes, the large handwriting.

"Q. And the small handwriting?

"A. Not that.

"Q. Whose handwriting is that?

"A. Of the lady.

"Q. Of the defendant lady?

"A. I think so, because it is not mine.

"Q. *But is the large handwriting yours, that is, those figures, are they yours?*

"A. Yes, sir.

"Q. Then, Mrs. Arias, in August, 1949, what happened between you and Mrs. Torres Córdova de Luff?

"A. *Mrs. Torres Córdova asked me for money.*

"Q. For what purpose?

"A. For what purpose?

"Q. As a loan?

"A. *She asked me for money, that I lend her money, that I give it to her.*

"Q. And what did you do? What amount did you then give her?

"A. I gave her different sums.

"Q. How much money did you give her the first time?

"A. The first time I gave her $1,062.

"Q. One thousand sixty-two dollars?

"A. Yes, sir.

"Q. And then did you give her, later, another sum of money in that same month?

"A. Yes, sir. During the month of August I gave her $2,772.

"Q. And then, in that same month, did you give her any other amount?

"A. Yes, five hundred dollars.

"Q. Which made a total of . . .?

"A. Of $4,334.

"Q. When was that money to be paid?

"A. On August 31.

"Q. Of that same year?

"A. Yes, sir.

"Q. *What happened on August 31 of that same year?*

"A. *She gave me the checks. I went to collect them and she had no funds.*

"Q. *Did she give you any checks?*

"A. *Yes, but they are altered. They do not have the same amounts.*

"Q. Showing the witness three checks of August 31, 1949: one in the sum of $530, another in the sum of $1,195 and another in the sum of $3,080, which are signed by Carmen Luff and bearing a note from the Banco Crédito y Ahorro Ponceño, San Juan Branch, of September 8, 1949—'*insufficient funds*' —what is this?

"A. The checks she gave me.

"Q. Were you satisfied with those checks or did you tell her something?

"A. I was not satisfied *because they were altered in a larger sum than I had given her.* I told her I would take the money I had given her and return the rest.

"Q. Did this check for $530 have a sum in excess?

"A. Yes, she told me to deduct the excess, the thirty dollars.

"Q. And to deduct how much from the check of $1,195?

"A. To deduct one hundred and eighteen dollars.

"Q. Had you written that in that paper?

"A. Yes, she told me to do that also.

"Q. And in the check for $3,080?

"A. Yes, to deduct three hundred eight dollars, in order to pay her the principal.

"Q. And you wrote it all down in that paper?

"A. Yes, the principal which I gave her was $4,334.

"Q. And what happened with those checks?

"A. *They were not honored, because of insufficient funds.*

"Q. *Were you going to keep all that money?*

"A. *The money belonging to me and return the rest to her.*

"Q. How much?

"A. *Four hundred odd dollars.*

"Q. *The difference which she told you according to that paper?*

"A. *On that paper.*

"Q. And why was she giving you that money which is written on that paper?

"A. She told me to deduct that.

"Q. And how much were you going to receive?

"A. Only what I gave her, and nothing else; and return to her every single penny more.

"Q. And did you present this check to the bank?

"A. Yes, sir.

"Q. And, were there any funds?

"A. *I was told that she did not have sufficient funds.*

"Q. Have you been paid these amounts on any occasion after this?

"A. Not a single penny.

"Q. Is the total sum of $4,334 owed to you?

"A. Yes, sir.

"Q. *Did you, on any occasion take or collect money from her as interest?*

"A. *No, never.*

"Q. *Had she ever taken money from you at any other time?*

"A. *Yes, always.*

"Q. Did she return it?

"A. *Yes, she returned it.*

"Plaintiff: That is all, Your Honor.

"To offer the checks with the bank's note.

"Defendant: No objection.

"Judge: They are admitted and marked together Exhibit I."
(Tr. 2–7.)

On cross-examination by defendant's counsel, she answered as follows:

"Defendant:

"Have you heard about these individuals: Elías Lopés and Lube Sierra?

"A. No, well, of course, I have heard about them because I read in the newspapers about them.

"Q. Do you know if they have anything to do with this case?

"A. No, sir, they have nothing to do with it.

"Q. You know that they have nothing to do with this case?

A. Absolutely nothing.

"Plaintiff: I object, Your Honor. This is a loan to this defendant. I don't see why they have to bring here the names of other persons who have nothing to do with the transaction in this case. Nothing about this was testified on direct examination and now the defendant wants to include this theory in this examination.

"Defendant: I want *to prove that the witness knew what the money was for.*

"Judge: The question is admitted.

"Defendant:

"Q. Your answer, madam, is that you know that Lopés and Lube Sierra have nothing to do with this matter?

"A. Well, *my answer is yes, that they have nothing to do with this because I delivered my money to Carmen Torres.*

"Q. *What for?*

"A. What for, I don't know. She went to my house to ask me for the money. That is why the checks which I have are signed by Carmen Torres de Luff.

"Q. You do not know what she wanted the money for?

"A. I don't know. And I was not interested for what she wanted it.

"Q. Do you know whether she has a business?

"A. Yes, I know that she is a hard working, honorable and good person, but I do not know . . .

"Q. But you did not know why she needed the money?

"A. No, I do not know.

"Q. And she did not tell you?

"A. No, she did not tell me.

"Q. And how much did she say she needed?

"A. The amount that I have said and the amount stated in the checks.

"Q. The first time she went to see you she told you she needed one thousand sixty-two dollars?

"A. Yes, sir.

"Q. And later? How much later was the second time?

"A. In the same month of August.

"Q. Then, the first time it was one thousand and sixty-two dollars?

"A. Yes, sir.

"Q. And the third time how much did she say she needed?

"A. Five hundred dollars.

"Q. She said she needed five hundred dollars?

"A. Yes, sir.

". . . . . . . . .

"Q. And you say that formerly you had lent money to Carmen Torres?

"A. Yes, sir.

"Q. Do you remember, on those occasions when you lent money to Carmen Torres, what she wanted it for?

"A. No, I know she was a business woman and that she was reliable.

"Q. Didn't you collect interest from Carmen Torres for the money you lent her?

"A. No.

"Q. Do you know for how much you sued Carmen Torres here?

"A. For the amount of the checks—for what she owed me.

"Q. Let us see: You have said two different things. For the amount of the checks or for what she owed you?

"A. For what she owed me.

"Q. Was it not for the amount of the checks, as you first said?

"A. For what she owed me, sir.

"Q. First you said 'for the amount of the checks' . . .?

"A. Well . . .

"Q. Is that the truth or not?

"A. For the amount, for the amount—for the whole amount of the checks or whatever it is. I sued her for what she owed me.

"Q. And how much did she owe you?

"A. . . . . . . . .

"Q. Do you know? Your lifetime savings. How much was it? Tell me.

"A. . . . . . . . .

"Q. Don't look at your attorney, look at me.

"Plaintiff: No, she is not looking at me. She is looking at the paper.

"Defendant: If she needs the paper say so and I will show it to her.

"Witness:

"A. I sued her for what she owed me; for what my attorney stated.

"Q. And how much did she owe you?

"A. Four thousand odd dollars.

"Q. Don't you remember the odd figure?

"A. Three hundred, more or less.

"Q. Don't you know whether it was for four thousand three hundred or for four thousand eight hundred?

"A. For what she owes me, for what she conscientiously knows she owes me.

Q. Now, the checks which you identified, when did Carmen Torres give them to you, approximately when, on what occasion?

"A. That she gave them to me?

"A. Yes.

"A. On the last of August.

"Q. On the last day of August?

"A. Yes, sir.

"Q. That is, after you had given to Carmen the three sums of money?

"Defendant:

A. Afterwards. Because I trusted her.

"Q. And when the three sums were already due . . . —is that so?

"A. Yes.

"Q. — . . . She gave you three checks then?

"A. Yes, sir.

"Q. And do you have the receipt which she gave you then, for each sum of money you delivered to her?

"A. No, she did not give me any receipt. I gave it to her out of friendship. I was a close friend of hers.

"Q. Out of friendship and without a receipt?

"A. Yes, sir.

"Q. Then explain it to me again. Why were those checks made out for a sum other than the one you had delivered?

"A. .  .  .  .  .  .  .  .

"Q. Explain to me why it was so. Or don't you know?

"A. .  .  .  .  .  .  .  .

"Q. Why was each one of those checks issued for a sum other than the one you had delivered to Carmen Torres?

"A. Ah, she gave them to me that way. She told me to deduct a certain sum. That is why it is stated in the paper.

"Q. That she told you to deduct what?

"A. An amount.

"Q. An amount from the checks?

"A. Yes.

"Q. When did she tell you to do so?

"A. At that time.

"Q. When she gave you the checks?

"A. Yes.

"Q. Was it that way?

"A. Yes.

"Q. And that other paper which you identified . . .

"Defendant: Strike the first part of that question.

"Q. Tell me, madam, then you do not know why the checks were issued in a larger sum than the one you delivered, right?

"A. I do not know.

"Q. You do not know?

"A. No.

"Q. You cannot explain why?

"A. No.

"Q. Now I am going to show you Exhibit No. 1 of the plaintiff and after examining that document perhaps you can explain to me the difference. Look at it and tell me, after examining this document, if you know now the reason for the difference. . . .?

"A. That was what she promised me. That is why they are deducted so that she can pay me the principal of my money. She has not paid me a single cent.

"Q. The only thing I am asking you, madam, is whether you know now the reason for the difference between the money which you gave to her and the amount of each check.

"A. .    .    .    .    .    .    .    .

"Plaintiff: Are you referring to this handwriting?

"Defendant: I am referring to the question which I have asked her, which is completely clear. I want her to explain to me, after having read that paper which she identified. Now she can tell me, she can explain that difference to me.

"Judge:

" —Read the paper, madam.

"Plaintiff:

" —There is another handwriting, madam; read it all.

"Witness:

"A. In the checks  . . .

"Judge:

" —Not out loud. You read it to yourself and then answer.

"Defendant:

"Q. Can you explain the difference to me, now?

"Witness:

"A. Can you repeat the question?

"Q. Why was each of the checks made out in a larger sum than the amount which you gave to Carmen Torres? You said that you could not explain. Now I ask you whether, after reading this paper, you can explain to me why there is a difference between each check and each sum delivered? Can you explain the difference to me?

"A. She told me to do so. This is her handwriting. It is not mine. She authorized me to deduct that.

"Q. The figures?

"A. They are mine.

"Q. And this that says 'interest,' 'principal,' is that your handwriting?

"A. Yes, sir.

"Q. And the other handwriting, is it Carmen Torres'?

"A. I suppose it is hers because it is not mine.

"Q. Then, you say, she promised to pay you something, right?

"A. .      .      .      .      .      .      .      .

"Q. Interest?

"A. *She promised to bring me the checks and to pay me something—might be interest—but I told her to pay me what she owed me. But there is no percentage there—only some crazy amounts . . .*

"Q. Did you compute those crazy amounts and determine that they refer to a percentage?

"A. Well, I deducted what she told me to deduct.

"Q. And then you deducted what she told you to deduct?

"A. The excess amount in the checks.

"Q. But didn't you say that you went to the bank to cash the checks?

"A. Yes.

"Q. Without deducting anything?

"A. Yes, but I was going to return to her what she had put in excess in the checks. That excess I was going to return to her.

"Q. And that idea of the deduction, or the instruction given to you to deduct, was it given by Carmen Torres at the time she gave you the checks?

"A. Yes.

"Q. Is that right?

"A. Yes.

"Q. Is it not true, Mrs. Arias, that each time you gave Carmen Torres a sum of money, she gave you a check?

"A. No, that is not true. She gave me the checks on the last day of August.

"Q. — . . . with instructions to deduct the interest?

"A. Yes, to deduct the interest.

"Plaintiff: It has not been said here it was interest. It has been said here that they were amounts.

"Defendant: In the paper written by her it says so.

"Plaintiff: The other lady says so, but not . . .

"Defendant: No. In the paper she wrote it is stated what is the interest and what is principal.

"Plaintiff: Well . . .

"Defendant:

"Q. Now, madam, when the checks were returned because of insufficient funds, did you go to doña Carmen?

"Witness:

"A. Yes. I went several times to see her and she always promised to pay me.

"Q. And what reason did she give you for failing to pay on August 31 or September 8?

"A. She always promised to pay me, pay me, pay me.

"Q. But you did not ask her why she did not pay you at the time she promised to pay you? Don't you know what happened to her?

"A. I do not know.

"Q. Don't you know why she was unable to pay you the four thousand odd dollars?

"A. .    .    .    .    .    .    .    .

"Q. Think again. Refresh your memory.

"A. She always promised to pay me. At no time did she deny that she owed me money. *And it has been that way in the statements before the prosecuting attorney and in everything.* She has always admitted it.

"Q. And in this case, she has also admitted that she owes you that money?

"A. Well, she . . .

"Q. Don't you know now why she was unable to pay you?

"A. .    .    .    .    .    .    .    .

"Q. Don't you know?

"A. She did not pay.

"Plaintiff: I am going to object now, Your Honor. He should not insist on those questions inasmuch as they are completely irrelevant and impertinent. If she could have paid, that is really important. But if she was unable to pay, the reason is not pertinent.

"Judge: The question is whether Carmen Torres explained to her why she had not paid her.

"Defendant:

"Q. Don't you know yet, madam, why Carmen Torres was unable to pay you? (Tr. 11–20.)

"Witness: She has not explained it to me.

"Defendant: That is all."

Defendant's cross-examination tended to establish the usurious nature of the operations between the plaintiff and the defendant. The plaintiff's cross-examination, copied above in its entirety, except one or two incidents on the pertinence of the evidence or the origin of the money loaned by the plaintiff, covers from page 8 to page 20 of the transcript of the evidence. As to plaintiff's possible knowledge of defendant's transactions with Mr. Lopés and Mr. Sierra, there is about one page (Tr. 8–9) and a single question at page 20. The rest of the examination refers to the usurious nature of the transactions between the plaintiff and the defendant.

But there is still more. While arguing his case defendant's counsel requested the Court to settle in the weighing of the evidence the following issues in litigation:

"Now, Your Honor, at this stage of the proceeding I want to raise a legal question: In the first place, there are two technical defenses, one in the event Your Honor believes that Carmen Arias lent money to Carmen Torres. In that case we contend, first, that the transaction is vitiated by usury and that, therefore, the proper judgment would be for only seventy-five per cent of the principal in favor of the plaintiff, and twenty-five per cent in favor of the People.

"The second technical defense: That should any judgment be rendered against the defendant, it would be rendered in her capacity as an independent woman, that is, in her capacity as

a separate individual, for although Tomás Luff, her husband, was made a party defendant, there is nothing in the evidence showing that he sanctioned or even knew about these transactions; and, therefore, that the transactions have nothing to do with the conjugal partnership. It is not the case of purchases for the family or obligations for their support, since, as we have seen, any obligation that Carmen Torres had here would be hers separately and never of the conjugal partnership. Therefore, in our opinion, if Your Honor believes that a judgment lies against Carmen Torres in the instant case, it should be limited to her separate property alone.

"That is the legal question which we now raise for your consideration.

"Judge: The other party . . .

"Plaintiff: With our objection.

"The evidence is entirely clear as to the nature of the three loans made by the plaintiff, Carmen Arias, to the defendant, Carmen Torres de Luff. As to that particular, the evidence is sufficient, in the light of the facts which we construed in our former argument.

"Now, as to the question that the husband cannot be affected by the judgment, that is a question which has been untimely raised by the colleague. And in that case, I did not need to introduce evidence to establish that there was an association and consent between the husband and wife in this transaction. If that question had been timely raised, I would have introduced evidence to Your Honor; but inasmuch as there was nothing in the pleadings, I had nothing to prove concerning this aspect."

Apparently giving credit to the plaintiff's testimony, the first time that it passed on the facts, the trial court found proved the fact that "the defendants and especially the defendant Carmen Torres de Luff, during 1949, borrowed from the plaintiff the sum of four thousand, three hundred and thirty-four dollars ($4,334) in three amounts of two thousand seven hundred and seventy-two dollars ($2,772), one thousand sixty-two dollars ($1,062) and five hundred dollars ($500) to be paid on August 31 of said year.

This finding was partly erroneous. As has been seen, when the plaintiff filed her complaint she intended to recover both the principal and the usurious interest of the three checks issued by the defendant in her favor. It was after the special defense of usury was raised that the plaintiff testified that what plaintiff had actually lent the defendant was $2,772, $1,062 and $500, that is, the amount of $4,334 (Tr. 4–5) and not the loans covered by the checks of $3,080, $1,195 and $530, that is, the amount of $4,805 claimed in the complaint. Her testimony is the typical testimony of the person who anxiously undertakes to hide the usurious character of her transactions. But against her statement there are two irrefutable proofs: (1) the three checks of $3,080, $1,195 and $530 issued by the defendant and accepted by the plaintiff, and (2) a written liquidation where plaintiff herself fractions the amounts of each check as follows: $3,080 less $308 interest, equals $2,772 principal; $1,180 less $118 interest equals $1,062 principal; $530 less $30 interest, equals $500 principal. Defendant did not fabricate this evidence. It bears the trace of plaintiff's own hand and the trial court could not overlook it. Still less, when faced with the hesitant and at times incredible statements of the plaintiff in the sense that defendant herself altered the amounts of the checks, making herself, as borrower, liable for an amount greater than the one received as loan.

If our law concerning usurious interest provided the automatic forfeiture of the whole usurious loan, as it should be in reality of justice, the testimony of the plaintiff would have been sufficient to dismiss plaintiff's claim. But the law only demands the forfeiture of part of the principal lent. That is why in concluding that the transaction between the parties was a loan, the court should have passed judgment on whether or not the loan was usurious, inasmuch as in the pleadings, as well as in the argument of the case, its atten-

tion had been specifically called to this aspect of the question in issue.

The defendant moved for reconsideration on the following grounds:

"2. That the judgment insofar as the defendant Thomas Luff, and the conjugal partnership constituted between Thomas Luff and Carmen Torres Córdova de Luff, are concerned, surely was due to inadvertence, in as much as there is no proof whatsoever to uphold said judgment.

"3. That the judgment insofar as Carmen Torres Córdova de Luff is concerned, surely arose from some error or inadvertence in whatever recollection the judge had of the evidence introduced on March 5, 1952, at the trial held in the case at bar, inasmuch as the evidence which consisted of the testimony of the plaintiff and of the defendant, Carmen Torres Córdova de Luff, is predominantly in favor of the defendant and against the plaintiff.

"5. In case the court should not grant wholly the motion for reconsideration, the appearing parties point out the fact that the findings of fact are inadequate for the purposes of an appeal, and, in particular, they request this Court to make findings of fact concerning the following points:

"(a) Which were the exact dates and the exact amounts of the loans made in 1949 by the plaintiff to the defendants or to any one of them.

"(b) Whether or not it was agreed to pay interest on the loan or loans and what was the rate of interest agreed upon.

"(c) Whether or not plaintiff knew that the money that she gave to the defendant was to be lent to a third party.

"(d) Whether or not the defendant acted as plaintiff's agent in connection with the sums of money delivered by the plaintiff."

By virtue of said reconsideration, the trial court overruled its former finding of fact and concluded anew that: "(1) In August, 1949, the plaintiff gave to the defendant, Carmen Torres de Luff, the sum of four thousand, three hundred and thirty-four dollars, in three amounts, for Carmen Torres de Luff to invest it by *lending it to third persons*, which Carmen Torres de Luff did; (2) none of the defend-

ants took from plaintiff, as loan, the sum of four thousand, three hundred and thirty four dollars alleged in the complaint, as amended. (It refers to an amendment as a result of the evidence.)

We shall begin by analyzing as a whole the testimony of the defendant, to whom the trial court seems to have given credence in its second version on the facts.

Mrs. Carmen Torres Córdova de Luff testified as to the nature of her intervention as follows:

"A. Those sums were given to me in three different checks. *They* phoned me from the Department of the Interior, and if I could not go I sent one of those who worked with us or with my brother, and she sent me her bank book with the slip signed, so that I could withdraw the money from the bank. On another occasion her aunt came and gave me the money. I went many times to the Department of the Interior, when she called me—that she had plenty of money and wanted to lend it.

"Q. Weren't you the one who called, telling her you needed that money?

"A. No. I could not be responsible for that money because I only had my employment *at the time*—neither could my husband.

"Q. And do you say that she wanted to lend? *Then she wanted to lend money through you?*

"A. Exactly.

"Q. *To whom?*

"A. Well, she knew that I had lent money *on one occasion to Lopés* because she heard a conversation—I was speaking to my brother as to the fact that they paid a higher interest on the money.

"Q. And who was he? Or they?

"A. Elías Lopés—Elías G. Lopés Realty Company. Elías G. Lopés was the one who paid the money." (Tr. pp. 24 and 25.)

The defendant further testifies:

"Q. The plaintiff, Carmen Arias, has said that, prior to these three deliveries of money in August, *she had previously lent you money. . . . ?*

"A. Many times.

"Q. She said that about two months previously.

"A. Yes, many times—about six or seven months before.

"Q. *And for what purpose were those loans made?*

"A. *For that same purpose*—different amounts. She would say, 'so much interest.' And I would consult Lopés and he would say, 'today I cannot give her that much; tomorrow I may give her so much.' I would tell her and she would send me the money.

"Q. What compensation did you derive from said transactions?

"A. She never gave me a penny.

"Q. Did she receive any profits from those transactions?

"A. Many.

"Q. The checks introduced in evidence by the plaintiff . . . and I show exhibit 1 to the witness.

"A. Yes, I delivered them . . .

"Q. One moment, please. Let me ask the question —. . . how and when did you deliver those checks?

"A. Those checks are dated August 31. But it was because they were going to collect that money on said date. These three checks, one I gave exactly on August 3, 1949, another on August 10, 1949, and the other on August 5, 1949. The last one earned $30 interest in a week alone. That is why it is for $530; and that is why the other is for $1,195, which earned . . . There she was making a little more than ten per cent monthly. The other is . . .

"Q. What connection did you have with Lopés? Were you Lopés' employee?

"A. No.

"Q. What connection did you have with Lopés?

"A. Well, simply that he lent money; and one day someone came to my house commenting that a retired employee of the Auditor's office had taken that loan, that he had lent him money and paid him a high interest. And they told me that I could, *in an evolution which I was going to make* with a small house, well, that *I could make some transactions.* And then, well, *I recommended him to some friends.* I only knew him as a

former employee of the Lottery. They had their office and I visited it on two or three occasions. I also knew of some other friends who had business with him. *He always gave a document*—the existence of which must be on record in the office of Lic. Valladares—*that when the document did not come on time, I gave these checks;* and when he brought the money in cash—always, not in checks—well, they came at the end of the month in which it was due and collected that money.

"Q. Why was the amount agreed upon in each one of those three checks never paid to Mrs. Carmen Arias?

"A. Because it was at that time that Lopés disappeared —and it was then that I lost my house—because of a document which was unfortunately signed without security. The deeds were signed by a single document without any security. It was a document exactly like the one he gave us each time that he was given money.

"Q. But did you say that Lopés disappeared?

"A. Yes, sir.

"Q. And did he appear later at any time and have you been able to collect that money.

"A. Yes, he appeared, but it was then time for the trial to be held. I don't believe that anybody tried to interview him in order to collect the money.

"Q. Have you taken any steps to collect that money?

"A. I have filed a complaint in court in an attempt to collect the money from my house. Said complaint was filed in the first instance to recover my house for a very considerable amount and I was left penniless. For him to disappear and for me to be left flat broke was one and the same thing. In a week's time he had already sold the property remortgaged. (Tr. pp. 26–29.)"

On cross-examination by plaintiff's counsel, the defendant answered:

"Q. Then, madam, it is evident that you had many transactions with Lopés?

"A. Yes, sir.

"Q. And you collected money from your friends and gave it to Lopés?

"A. Yes, sir.

"Q. And you collected money from your friends and gave it to Lopés?

"A. Yes.

"Q. At an exorbitant interest, according to you?

"A. Yes. (Tr. pp. 29–30.)"

This testimony leaves the case in a cloud of uncertainty as to the plaintiff's knowledge concerning defendant's transactions with Mr. Lopés, a most essential point in order to determine the defendant's liability. Defendant's testimony on this aspect of the case is so deficient that it does not go beyond a phrase: *"Well, she knew that on one occasion I had lent money to Lopés"* (Tr. 25). She does not state categorically that at the time that the three checks were claimed, which is the basis for this litigation, the plaintiff knew that the money lent or delivered to the defendant was for Mr. Lopés. Her whole testimony is characterized by this elusive way of answering. When she is asked: "What compensation did you derive from said transactions?" she answers: "She never gave me a penny." (Tr. 27) ; but she does not make clear what Mr. Lopés might have given her, an essential point in order to determine her character as an intermediary. It may be that the plaintiff did not give her a single cent for her diligent brokerage, but it may be that she received her commission or bonus from Mr. Lopés.

When she is asked whether the plaintiff *had lent her money*, she answers " . . . many times . . . *For that same purpose*—different amounts. She would say 'so much interest.' And I would consult Lopés and he would say, 'today I cannot give her that much; tomorrow I may give her so much'. I would tell her and she would send me the money." (Tr. 26–27.)

We already know what the defendant did with the money *that she borrowed* from the plaintiff. Let us see now if there is any other version in the evidence as to what she did with

the money *which she did not borrow from the plaintiff*, but which she delivered as a simple intermediary, according to the pleadings, or as a simple agent, according to the theory of the case set up at the hearing. When she is asked by her attorney: "And do you say that she wanted to lend? Then she wanted to lend money through you?" she answers: "Exactly". When she is further asked: "To whom?" she answers: "*Well, she knew that on one occasion I had lent money to Lopés . . .*" (Tr. 25.) Aside from that vague phrase, the only thing found in the transcript of the evidence which might have any connection with defendant's capacity as intermediary or agent is another loose phrase which says: "And they told me that I could, in an evolution which I was going to make with a small house, well, that I could make some transactions. *And then, well, I recommended him to some friends.*" It is not explained why she recommended him to some friends: whether to enable said friends to do business directly with Mr. Lopés or through her. Neither is it clarified whether the transactions were made with the money from defendant's house or her friend's money.

As to the checks issued by the defendant which represented the money lent plus the interest, according to plaintiff's evidence, the theory of the defendant's pleadings was "That the plaintiff required the defendant, Carmen Torres Córdova de Luff, to issue those checks as receipts for said amount of money to be used solely and exclusively as substitutes for receipts but not checks to be presented for collection, *since the plaintiff was well aware that the defendant did not have an account in the bank to cover said checks.*" The evidence showed that the defendant did carry a bank account, but that the checks were returned for insufficiency of funds. (Exhibit 1). The same defendant testified that she gave those checks to the plaintiff on August 3, 1949, on August 5, 1949, and on August 10, 1949, all three to become due on August 31, 1949, (Tr. 27.) The reason the defendant

delivered those checks is, according to her, that: "He [Lopés] always gave a document . . . that when the document did not come on time, I gave these checks; . . ." She is silent as to whom Mr. Lopés gave such document, whether to the plaintiff or to the defendant and there is nothing in the transcript showing that in the case of the three checks object of the suit, the plaintiff or the defendant received the documents from Mr. Lopés. What is more, *there is no evidence that the defendant delivered the amounts which she had received from the plaintiff to Mr. Lopés.* Her testimony describes the practice followed but it does not specify what became of the three amounts which in August, 1949, the plaintiff gave her. If he always gave a document when he received money and on this occasion he did not do so, it is possible to infer that he did not receive the money. However, the defendant admits that she received the money from the plaintiff and that she issued the three checks in favor of the plaintiff. In order to establish the relation of gratuitous agent or solicitous intermediary which the defendant alleged and sought to prove, *the fact that she directly delivered plaintiff's funds to Mr. Lopés should have been established in the evidence in an uncontroverted manner.*

When the whole situation is calmly examined, without any prejudice against the alleged usurer nor sympathy towards the possible intermediary, what the evidence discloses is a case of a simple operation of refinancing of money; the plaintiff lent money to the defendant, the defendant to Mr. Lopés and Mr. Lopés to his clients, the latter at an *exorbitant interest.* (Tr. p. 30.) The subconscious elements of truth gain weight little by little over the conscious elements of improvisation.

Why was the defendant bound to give those checks? Assuming that her intervention in this case was that of a solicitous intermediary, as the defendant sought to establish

in her pleadings, she had no obligation to give them inasmuch as she was liable to no one, either with respect to the moneylender or with respect to the borrower. But defendant's own phrase "that when the document did not come on time I gave these checks," implies that those checks constituted the intermediary's own guaranty until the document which she bought reached the hands of the moneylender. There is nothing in the evidence showing that in the case at bar the documents issued by Mr. Lopés were delivered by the defendant to the plaintiff in order to unburden herself of her liability as an intermediary.

Assuming that the defendant's intervention in the case at bar was that of a gratuitous agent, as the defendant sought to establish in the theory of the evidence, the phrase "she wanted to lend money through you," stated rather by defendant's counsel than by her, is not sufficient at law to establish an agency. The practical way of determining juridically whether a person has acted in representation of another is to consider whether the person who has received the service or the thing is bound with the principal in any manner. There is no possible way of determining by the evidence introduced before the trial court whether Mr. Lopés was bound in favor of the plaintiff or of the defendant. According to the way the evidence presents the case, it seems that what happened was that Mr. Lopés disappeared after receiving the money without executing any document at all, inasmuch as the defendant could not collect the checks which she gave until Mr. Lopés, in turn, gave the document.

But let us assume that the evidence contained the juridical elements of the agency and that the same was sufficient to determine the juridical absence of will presumed in such agency. Because of the fact that she had authority to lend through her conduit, should the liability of an agent be considered ended merely because the lender disappeared with

the money? For that she has to prove that she is free from fraud or negligence.

Section 1617 of the Civil Code of Puerto Rico provides that "An agent is liable not only for fraud, but also for negligence . . ." Assuming as being most favorable to the opposite theory that the defendant had not committed fraud, was she to be free from negligence? Negligence is the lack of diligence in the discharge of the mission entrusted: 11 Manresa 537 (Instituto Editorial Reus, 1950 Ed.) In complying with the agency, the agent shall follow the instructions of the principal and in the absence of these instructions, he shall do all that which, according to the character of the business, would be done by a good father of a family, pursuant to § 1610 of the Civil Code of Puerto Rico. The good father of a family (bonus pater familias) is "A clever and prudent man in the direction of his own business." (Manresa *op cit.*) Said diligence is demanded from the gratuitous agent as well as from the one receiving a commission.

What proof of diligence does the record disclose in this case? None. When defendant is asked: "Why was the amount agreed upon in each one of those three checks never paid to Mrs. Carmen Arias?" she answers: "Because it was at that time that Lopés disappeared—and it was then that I lost my house . . ." (Tr. 28.) There is not the slightest proof that before delivering plaintiff's money the defendant obtained the document that Mr. Lopés used to give; there is not the slightest evidence of the measures adopted by the agent in order to comply faithfully with the instructions of her principal. When she is asked: "Have you taken any steps to collect that money?", she answers: "I have filed a complaint in court in an attempt to collect the money from my house. *Said complaint was filed in the first instance* to recover my house for a very considerable amount and I was left penniless. *For him to disappear and for me to be left flat broke was one and the same thing.*" (Tr. pp. 26–29.)

As may be seen, the defendant was involved in Mr. Ló-pés' business with her own money as well as with the money that she borrowed from her friends. She is never able to make a clear distinction as to the time when she acted directly as a lender or as a refinancer of the money lent to her.

Perhaps the trial court concluded on its own account that the case was one of a simple moral obligation whereby the defendant was not liable. The recommendation and the advice do not constitute juridical obligations if they do not go beyond that, whenever it is a recommendation or an advice, because they belong to the field of moral obligations. But as soon as they transgress their own limits they become a juridical act demandable between the parties. As well put by Manresa in his gloss of § 1709 of the Spanish Civil Code, equivalent to § 1600 of the Civil Code of Puerto Rico, "the moral fact has become a juridical act." This was not a case of a simple recommendation or advice, but of a recommendation or advice accompanied by a mission to invest money and to buy a document with said money. It is natural that the recommendation or the advice became an agency according to the defendant's own theory.

Whether it was the case of a nameless or a typical contract, of an officious brokerage, of a presumed modality of the contract of agency, of a transitory deposit of money, of a constructive trust (meaning unjust enrichment), or of a recommendation or advice transformed into an agency, the defendant ought to have shown her diligence in order to be freed from her obligation in the instant case.

The result is that the plaintiff has been left without a cause of action against the defendant as well as against the ultimate borrower, and the Commonwealth of Puerto Rico, in a treble usurious operation, expressly accepted by the defendant as to her own transactions, has been left without the part of the principal to which it is entitled in every usurious transaction.